IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 29, 2020

## STATE OF TENNESSEE v. SPARKLE TRENETTA JONES

**Appeal from the Criminal Court for Knox County**
**No. 111619   G. Scott Green, Judge**

FILED

JUL 2 3 2020

Clerk of the Appellate Courts
Rec'd by_____

**No. E2019-00804-CCA-R3-CD**

A Knox County Criminal Court Jury convicted the Appellant, Sparkle Trenetta Jones, of selling and delivering less than fifteen grams of heroin within a drug-free school zone, Class A felonies. After a sentencing hearing, the trial court ordered that she serve seventeen years for each conviction and merged the convictions. On appeal, the Appellant contends that the evidence is insufficient to support the convictions; that trial court committed plain error by allowing irrelevant testimony; and that the trial court erred by applying two enhancement factors. Based upon the record and the parties' brief, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Joshua D. Hedrick (on appeal) and Forrest Wallace (at trial), Knoxville, Tennessee, for the appellant, Sparkle Trenetta Jones.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Charme P. Allen, District Attorney General; and Hector Sanchez and Ashley McDermott, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

At trial, Investigator Philip Jinks of the Knoxville Police Department (KPD) testified as an expert in narcotics investigations that on June 28, 2017, he used a confidential informant (CI), whom he had worked with previously, to purchase heroin from the Appellant. He explained that the CI came to the police department and that he searched

the CI for contraband and money on the CI's person. Investigator Jinks gave the CI four twenty-dollar bills and two ten-dollar bills and had the CI place a recorded telephone call to the Appellant. Investigator Jinks said that both he and the CI had the same telephone number for the Appellant and that he dialed the Appellant's telephone number or watched as the CI dialed the number. Investigator Jinks stated that he had talked with the Appellant "on several occasions," that he was familiar with her voice, and that he recognized her voice on June 28.

Investigator Jinks testified that after the CI's call to the Appellant, another officer transported the CI in an undercover KPD vehicle to the Inskip Market on Inskip Road. The CI was wearing a video recording device and an audio transmitter. Investigator Jinks was in a separate vehicle and pulled into a church parking lot on Rowan Road. While Investigator Jinks was in the parking lot, he saw a white Cadillac Escalade he recognized as belonging to the Appellant pass by the church. Investigator Jinks could not see the driver but saw two people in the Escalade. The Escalade turned from Rowan Road onto Inskip Road and pulled into the Inskip Market.

Investigator Jinks testified that the CI advised him via the transmitter that the CI was walking toward the Escalade. Investigator Jinks drove to the Inskip Market and saw a woman he did not recognize get out of the passenger side of the Escalade and go into the store. The CI got into the passenger side of the Escalade, and Investigator Jinks lost sight of him. However, Investigator Jinks was able to monitor the drug buy through the audio transmitter. He said that the transaction was "very quick" and that the CI exited the Escalade and returned to the undercover KPD vehicle. The unknown woman came out of the store and got back into the Escalade, and the Escalade left the parking lot. The CI and Investigator Jinks returned to the police department, and Investigator Jinks recovered the drugs, twenty dollars left over from the drug buy, and the recording equipment. He also searched the CI to make sure the CI did not keep any drugs or money.

Investigator Jinks testified that he paid the CI forty dollars for the drug buy, and he acknowledged that the CI had always been honest with him. The heroin the CI bought on June 28 weighed one-half gram, and Investigator Jinks sent the heroin to the Tennessee Bureau of Investigation (TBI) for analysis. Investigator Jinks said that although the Appellant was not present at the Inskip Market for the drug buy, it was "not uncommon" for someone to deliver drugs on behalf of someone else.

On cross-examination, Investigator Jinks acknowledged that he was surprised the Appellant did not deliver the heroin herself. After the drug buy, the Escalade returned to Rowan Road, and Investigator Jinks lost sight of it. He found it a few minutes later, though, at a house on Rowan Road. Investigator Jinks said that the house was owned by the Appellant's brother and that the Appellant was "staying there." The Escalade was

registered to the Appellant, but the address listed on her vehicle registration was for a residence on Edington Road in South Knoxville.

Casey Simonds testified that he used to be a heroin addict and that Investigator Jinks approached him about working as a CI. Simonds later contacted Investigator Jinks, and Investigator Jinks arranged for Simonds to make drug buys. On June 28, 2017, Simonds made a controlled telephone call to the Appellant, whom he had known about one year, and asked her for one-half gram of heroin. The State played an audio recording of the call for Simonds, and he identified the Appellant's voice on the recording. Simonds said the Appellant told him that she "would be walking." Investigator Jinks affixed a recording device on Simonds, and an officer drove Simonds to the Inskip Market. Simonds was expecting the Appellant to arrive on foot, so he got out of the undercover vehicle and walked around the outside of the market to look for her. He said he then sent her a text message, asking, "Where you at[?]"

Simonds testified that the Escalade pulled up to the store. A woman got out of the Escalade, and Simonds got into the vehicle. The Appellant was not in the Escalade, and Simonds asked the driver about her. The driver claimed to be the Appellant's brother and said the Appellant was "handling some business." Simonds gave money to the driver, and the driver gave heroin to Simonds. Simonds then returned to the KPD vehicle. Investigator Jinks had given Simonds one hundred dollars for the drug buy, and Simonds did not think he returned any money to the officer. Simonds said that he currently was in jail but that he was going to be released in exchange for his truthful testimony.

On cross-examination, Simonds testified that it was his "understanding" that the Appellant was in the Escalade but that she got out of the vehicle before it arrived at the Inskip Market. Investigator Jinks paid Simonds forty dollars for conducting the transaction, and Simonds had made about one thousand dollars working as a CI. Simonds said that he made several drug buys before and after the drug buy in this case and that he did not remember if he returned any money to Investigator Jinks. Simonds said that he had asked to be released from jail in exchange for his testimony but that he did not know if he would be released.

Gregory Starr testified that he and the Appellant "grew up together" in Detroit and that he was the Appellant's codefendant in this case. At the time of the Appellant's trial, Starr was in confinement. He said he had not been promised anything in exchange for his testimony.

Starr testified that on the afternoon of June 28, 2017, he and the Appellant were at a house on Rowan Road and were "just sitting there, kicking it, bagging up [heroin]." The Appellant received a telephone call from Simonds and told Starr, "Go serve the guy at the

- 3 -

gas station." Starr obtained the heroin from the Appellant and drove the Appellant's Escalade to the Inskip Market. He said he drove the Appellant's Escalade because "I always drive it." The Appellant's mother went with Starr. When they arrived at the Inskip Market, the Appellant's mother went inside the store, and Simonds got into the Escalade. Starr had never seen Simonds prior to June 28. Starr said he told Simonds that he was the Appellant's brother because "that's what I go by." Simonds gave Starr eighty dollars, and Starr gave Simonds the heroin. Simonds got out of the Escalade, the Appellant's mother got back into the vehicle, and Starr drove back to the house on Rowan Road. He said that he and the Appellant "split the sale" and that he "kept some" of the eighty dollars.

Sharon Norman of the Tennessee Bureau of Investigation's Crime Laboratory testified as an expert in forensic chemistry that she analyzed a powdery substance recovered in this case. The substance was heroin and weighed 0.46 grams.

Donna Roach, an employee of the Knox County KUB Geographic Information Systems (KGIS), testified as an expert in geographic information that she created a map showing the location of the Inskip Market. The address for the store was within a one-thousand-foot "buffer" around Inskip Elementary. Martin L. Tims, an investigator for the Knox County School Security Division, testified that Inskip Elementary was a school on June 28, 2017.

At the conclusion of Tims's testimony, the State rested its case, the trial court dismissed the jury for the day, and defense counsel made a motion for a judgment of acquittal, which the trial court denied. The following morning, defense counsel conducted a <u>Momon</u> hearing. At the conclusion of the hearing, the State requested to reopen its proof because "[i]t's come to our attention this morning that there was an assault that happened back in the slam this morning." The trial court held a jury-out hearing in order to determine whether the State should be allowed reopen its proof.

During the hearing, Mark Pressley testified that he was a court services officer for the Knox County Sheriff's Department. He then testified as follows:

> This morning, I was doing roll call in the slam. As I finished roll call, the elevator opened and the jailers brought up the female inmates and was putting them in the female slam. Ms. Jones was about next-to-last coming out. When she came out, she turned and looked at me, towards the other slam and says, well, is the snitch up here?

Officer Pressley said that he tried to "lighten the moment" by telling the Appellant, "[W]e don't call them that up here, they're cooperating witnesses[.]" He said that the other inmates laughed but that the Appellant did not laugh and had an "almost angry look on her

face." Simonds was approximately ten feet from Officer Pressley and the Appellant, and the inmates in both "slams" heard Officer Pressley's conversation with the Appellant. Upon being questioned by the trial court, Officer Pressley said the Appellant did not refer to Simonds by name.

Gregory Starr, the Appellant's codefendant, testified that he was in a holding cell that morning with five other men and that about twenty men, including Simonds, were in a cell across from his cell. Starr acknowledged that he heard the Appellant say something about "the whereabouts of a snitch." After the Appellant's comment, a white inmate with a red beard in Starr's cell stated that "Casey" was on his "paperwork." The Appellant responded that Casey was on her paperwork too. Starr did not hear the inmate with the red beard direct anyone to hurt Simonds. Starr did not see anyone hit Simonds, but he saw Simonds bleeding.

At the conclusion of hearing, the trial court ruled that "[t]he fact that she may or may not have gotten the whole thing started by running her mouth about where a snitch was is not enough to reopen proof and go back into this." However, the trial court told the Appellant that if the jury convicted her, the trial court was "certainly going to consider this" at sentencing.

The Appellant did not present any proof, and the jury convicted her as charged of one count of selling less than fifteen grams of heroin within a drug-free school zone and one count of delivering less than fifteen grams of heroin within a drug-free school zone, Class A felonies. After a sentencing hearing, the trial court sentenced her to seventeen years for each conviction and merged the convictions.

## II. Analysis

### A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support her convictions because Starr "took the Cadillac," met the CI at the Inskip Market, and conducted the transaction, showing that Starr was acting "on his own volition and not at the instruction or direction of Ms. Jones." In support of her argument, the Appellant contends, "Law enforcement expected the informant to spend $100 on a half-gram of heroin and gave him that amount for that purpose. The final purchase price, according to Mr. Starr, was $80 for a half-gram, indicating that a different bargain was struck between Mr. Starr and the informant." The State argues that the evidence is sufficient. We agree with the State.

It is an offense for a defendant knowingly to sell or deliver a controlled substance. Tenn. Code Ann. § 39-17-417(a)(2), (3). Heroin is a Schedule I controlled substance.

- 5 -

Tenn. Code Ann. § 39-17-406(c)(11). Ordinarily, selling or delivering a Schedule I controlled substance is a Class B felony. Tenn. Code Ann. § 39-17-417(b). However, selling or delivering a Schedule I controlled substance within one thousand feet of a public or private school is punished as a Class A felony. See Tenn. Code Ann. § 39-17-432(b).

Taken in the light most favorable to the State, the evidence shows that on June 28, 2017, Starr and the Appellant were bagging heroin at the Appellant's brother's house on Rowan Road. The CI telephoned the Appellant and asked to buy one-half gram of heroin from her. The Appellant agreed to the sale and agreed to meet the CI at the Inskip Market. The CI expected the Appellant to arrive on foot. Instead, the Appellant gave the heroin to Starr and sent him to the market to conduct the transaction. When Starr arrived at the store in the Appellant's Escalade, the CI got into the vehicle, and the CI and Starr exchanged eighty dollars for the heroin. Starr then returned to the home on Rowan Road. Although the Appellant claims that Starr conducted the transaction "on his own volition," Investigator Jinks, the CI, and Starr all testified that the CI arranged the transaction with the Appellant over the telephone. Starr also testified that the Appellant directed him to deliver and sell the heroin to the CI and that he "split" the money with her. Therefore, we conclude that the evidence is sufficient to support the Appellant's convictions.

B. Irrelevant Testimony

The Appellant claims that the trial court committed plain error by allowing Investigator Jinks to give irrelevant testimony. The State claims that the trial court did not err. We conclude that even if the trial court erred, the error does not rise to the level of plain error.

During Investigator Jinks's testimony, the State asked if he had seen "a spike" in heroin overdose deaths in Knox County, and he answered, "Yes, absolutely." The State also asked if he had been able to determine "where a lot of these heroin dealers are coming [from]," and he answered, "Well, of course, there are Knoxville residents who are -- who are heroin dealers. But without a doubt, our primary source city for heroin in Knoxville, Tennessee is Detroit, Michigan. Most of our heroin comes from Detroit." The State asked him where the Appellant was from, and he said she was from Detroit.

The Appellant claims that Investigator Jinks's testimony was irrelevant. The State argues that his testimony was relevant to show why the KPD was conducting controlled buys for heroin with paid CIs and was relevant to explain the Appellant's relationship with Starr, who also was from Detroit.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided. . . . Evidence which is not relevant is not admissible."

Initially, we note that police officers often testify at sentencing about a particular drug or crime being a problem in a county because such evidence is relevant to a defendant's request for alternative sentencing. See, e.g., State v. Khalid M. Mohssin, No. M2015-02125-CCA-R3-CD, 2016 WL 5851888, at *1 (Tenn. Crim. App. at Nashville, Oct. 6, 2016); State v. Roger Vines, No. M2011-01094-CCA-R3-CD, 2012 WL 2412164, at *8 (Tenn. Crim. App. at Knoxville, June 27, 2012); State v. Billy Staggs, No. M2007-01726-CCA-R3-CD, 2008 WL 4613803, at *1 (Tenn. Crim. App. at Nashville, Oct. 14, 2008). However, we agree with the Appellant that Investigator Jinks's testimony was irrelevant at trial. We fail to see how an increase in heroin overdose deaths, the fact that most heroin comes to Knoxville from Detroit, or the Appellant's being from Detroit made it more or less probable that the Appellant, who was a resident of Knoxville at the time of the drug transaction, sold heroin to the CI. Moreover, nothing indicates that the Appellant or Starr obtained the heroin sold in this case from Detroit.

However, the Appellant did not object to Investigator Jinks's testimony. Therefore, the Appellant will be entitled to relief only if the error rises to the level of plain error. We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotation marks and citation omitted).

Investigator Jinks and the CI testified that they recognized the Appellant's voice on the telephone during the call to arrange the drug buy, and Starr testified that he was bagging heroin with the Appellant when she received the CI's call. Starr further testified that the Appellant gave him the heroin, that the Appellant sent him to conduct the transaction with the CI, and that he split the money from the transaction with her. The evidence against the Appellant was strong. Thus, we conclude that consideration of the error is not necessary to do substantial justice and that the error was not of such a great magnitude that it probably

changed the outcome of the Appellant's trial. Accordingly, the Appellant is not entitled to plain error relief.

## C. Enhancement Factors

The Appellant claims that the trial court erred by applying two enhancement factors to her sentences. The State argues that the trial court properly sentenced the Appellant. We agree with the State.

At the Appellant's sentencing hearing, no witnesses testified, but the State introduced the Appellant's presentence report into evidence. According to the report, the thirty-six-year-old Appellant had three children aged eighteen, eleven, and nine years old. In the report, the Appellant stated that she dropped out of high school in the eleventh grade but that she obtained her GED. The Appellant described her mental health as "fair" and her physical health as "good" and said that she suffered from attention deficit disorder. The Appellant said in the report that she began consuming alcohol when she was nineteen years old and that she last consumed alcohol in 2017. She said that she began using marijuana when she was ten years old and that she used marijuana daily until 2017. The Appellant said that she began using opiates when she was twenty-two years old and that she used them daily until 2017. The Appellant reported taking anger management classes in 2017 and said that she had completed several programs while being held in the Knox County Detention Facility. According to the report, the Appellant worked as a motel housekeeper from January 2017 to December 2017, worked as a hair braider from January 2015 to December 2017, and worked in "line production" from January 2013 to August 2017. The report showed that the Appellant had prior misdemeanor convictions of contributing to the delinquency of a minor in 2017, reckless driving in 2016, and failure to carry and display a driver's license on demand in 2015 and 2019. The Appellant was on probation for contributing to the delinquency of a minor when she committed the offenses in this case.

The Appellant made a written allocution to the trial court, which defense counsel read aloud on the Appellant's behalf. In the allocution, the Appellant stated that she had been incarcerated for twelve months and that she had completed several treatment programs during that time. She said that she had three beautiful children, that she had raised those children, and that her actions had left the responsibility of caring for her children to her elderly mother. She said that she had let her family down and that she would be "eternally sorry." She requested that the trial court sentence her to the minimum punishment in the range so that she could "be there" for her children.

The trial court asked defense counsel if the trial court could apply enhancement factor (1) to the Appellant's sentences because the Appellant "called out that the snitch was

- 8 -

back there and then [the CI] was severely beaten." Defense counsel responded that "as much as I may object to it, I don't think I can stop the Court from considering that." The trial court then asked defense counsel, "Would you concede that that's prior criminal behavior . . . if this Court finds that, in fact, she directed or facilitated the assault of that witness?" Defense counsel said yes but argued that the trial court found the proof about the assault "too tenuous" for the State to reopen its case. The trial court responded that facts relevant to sentencing could be established by a preponderance of the evidence rather than a reasonable doubt.

The trial court noted that the Appellant was a Range I offender and found that the following enhancement factors were applicable to her sentences: (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range"; (2), that "[t]he defendant was a leader in the commission of an offense involving two (2) or more criminal actors"; and (13), that at the time the felony was committed, the defendant was released on probation. Tenn. Code Ann. § 40-35-114 (1), (2), (13)(C). The trial court ordered that the Appellant serve seventeen years, two years above the minimum punishment in the range for a Class A felony, for each conviction and merged the convictions. See Tenn. Code Ann. § 40-35-112(a)(1). The trial court noted that the Appellant was statutorily required to serve the minimum sentence in the range, fifteen years, at one hundred percent. See Tenn. Code Ann. § 39-17-432(c).

The Appellant claims that the trial court erred by enhancing her sentences based upon another jail inmate's fight with the CI and based upon her being a leader in the commission of the offense. In pronouncing that enhancement factor (1) was applicable to the Appellant's sentences, the trial court did not specifically address the jail incident. Nevertheless, the trial court stated that enhancement factor (1) was applicable based upon the Appellant's history of criminal convictions and "criminal behavior." Therefore, the trial court very well may have applied enhancement factor (1) based on the Appellant's comments in the jail. In any event, the trial court properly applied enhancement factor (1) based upon the Appellant's prior misdemeanor convictions. Therefore, the Appellant is not entitled to relief.

The Appellant also contends that the trial court erred by applying enhancement factor (2) regarding her being a leader in the commission of the offenses because the proof showed "[a]t best" that she and Starr "were of equal authority." In finding the factor applicable, though, the trial court explained,

> Enhancement 2 is applicable as well. She was a leader in the commission of an offense involving two or more people. The deal was set up with Ms. Jones. She's the one that knew the undercover person. The phone messages all confirm that. It was set [up] through her. Mr. Starr was

the -- for lack of a better way of putting it, the delivery man for her deal. That's what the Court finds.

The proof at trial supports the trial court's summary of the facts and, therefore, its application of enhancement factor (2). Thus, the trial court did not err by sentencing the Appellant to seventeen years for her convictions.

### III. Conclusion

Based upon the record and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

_Norma McGee Ogle_
NORMA MCGEE OGLE, JUDGE